**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

THOMAS B. FLETCHER, ET AL.                    CIVIL ACTION NO. 18-1153

VERSUS                                        JUDGE S. MAURICE HICKS, JR.

JULIAN WHITTINGTON, ET AL.                    JUDGE KAYLA MCCLUSKY

**MEMORANDUM RULING**

Before the Court are two Motions for Summary Judgment relating to the claims against Defendants Julian Whittington, Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith, Katie Rachal, Katrina Chandler, and the Bossier Sheriff's Office (collectively referred to as "the BSO Defendants"). See Record Documents 144 & 146. The first is a Motion for Summary Judgment (Record Document 144) filed by all BSO Defendants seeking summary judgment in their favor as to all claims made against them by Plaintiffs Thomas B. Fletcher and Gail A. Osborne-Fletcher ("Plaintiffs"). Plaintiffs opposed the motion. See Record Document 199. The BSO Defendants replied. See Record Document 203. For the reasons set forth below, the BSO Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

The second is Plaintiffs' Motion for Partial Summary Judgment (Record Document 146) seeking judgment as a matter of law in their favor against the following BSO Defendants: Julian Whittington, Robert Chavis, De Barnett, Julie Cochran, Blake Smith, and Katrina Chandler. Plaintiffs also moved for summary judgment against Dr. Russell

Roberts ("Dr. Roberts"), who is not a BSO Defendant.  See id.[1]  The BSO Defendants

listed and Dr. Roberts opposed the motion.  See Record Documents 192 & 212.  Plaintiffs

replied.  See Record Document 208 & 213.  For the reasons set forth below, Plaintiffs'

Motion for Partial Summary Judgment is **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a federal civil rights action (and state law survival action and wrongful death

action) brought by Plaintiffs, who are the parents of the deceased, Collin James Fletcher

("Fletcher").  See Record Document 217 (Second Amended Complaint).  Fletcher was

arrested by the Bossier City Police Department on September 3, 2017.  At the time of his

arrest, he was found to be in possession of approximately 202 Xanax bars.  See id. at ¶

23.  Fletcher was thereafter transported to the Bossier Maximum Security Facility, where

he remained until he was found dead in his cell during the early morning hours of

September 8, 2017.  See id. at ¶¶ 165-172.

On September 3, 2017, Fletcher completed an initial Corrections Division Medical

Screening form and stated that he took 100 mg of Zoloft daily and Xanax nightly.  See

Record Document 144-2 at 1.  He answered in the affirmative that he currently used

benzodiazepines and that he had recently been under a doctor's care for "psychiatric

anxiety."  Id. at 1-2.  On September 4, 2017, Fletcher completed an Intake Medical

---

[1] In a previous ruling, this Court denied Dr. Roberts' Motion for Summary Judgment (Record Document 139) as to Plaintiffs' Section 1983 Fourteenth Amendment inadequate medical care claim.  See Record Documents 235 & 236.  The Court held there were "genuine disputes of material fact regarding Dr. Roberts' knowledge of Fletcher's serious medical needs, namely if Dr. Roberts knew of and disregarded an excessive risk to Fletcher's health."  Record Document 325 at 8.  Thus, based on this previous ruling, Plaintiffs' Motion for Summary Judgment as to the inadequate medical care claim against Dr. Roberts is likewise **DENIED**.

Screening Questionnaire with Nurse Katrina Chandler, RN ("Chandler"), a BSO employee.  See Record Document 144-2 at 3.  The questionnaire listed Fletcher's current medications as Zoloft and Xanax; noted he had a seizure disorder one year ago; and listed depression and anxiety as his current mental health complaints/symptoms.  See id.  Chandler testified in her deposition that Fletcher was alert as to person, place, time and followed commands during the screening.  See Record Document 152, Exhibit A (Chandler Deposition) at 33.  Chandler also recalled that during the intake screening, Fletcher told her he took "a lot" of Xanax and that his past seizure was "probably" related to withdrawal.  Id. at 25-26.  Chandler put Fletcher on the mental health list to be seen by psychologist, Dr. Anita Flye ("Dr. Flye").  See id. at 40-41.  Chandler recalled that Fletcher told her he may have withdrawals from Xanax.  See id. at 48.  Fletcher told Chandler that he would have his father call with additional medical history.  See id. at 35.  Chandler decided to see Fletcher the next day to follow up for signs and symptoms of withdrawals. See id. at 46.

The next time Chandler saw Fletcher was on September 5, 2017. See id. at 48. She was called to the booking area where she was told by witnesses – including other inmates and correctional officers – that Fletcher had crossed his arms and fallen backwards.  See id.  Chandler and a paramedic were some of the first to arrive to the scene of Fletcher's fall. See id.  Deputy De Barnett, the Shift Supervisor, and Deputy Jeff Smith also responded to Fletcher's cell.  When Chandler arrived, Fletcher was awake, sitting against the wall and talking.  See id.  She ran her hand across the back of his head to check for a bump or lump and noticed nothing.  See id. at 48-49. She observed that he was awake and oriented and did not display any sluggishness.  See id. at 49.  Chandler

spoke with the witnesses to the fall, one of whom reported that he thought Fletcher did it on purpose.  See id.  Deputy De Barnett testified in his deposition that he believed Fletcher – who was in holding tank 11 at the time – had a seizure.  See Record Document 146-26 (Barnett Deposition) at 27.  Deputy Jeff Smith testified in his deposition that he assumed Fletcher had a seizure; there was no doubt Fletcher was in some sort of medical emergency; and they called medical.  See Record Document 146-22 (Smith Deposition) at 20-21.

Nurse Katie Rachal ("Rachal"), a BSO employee, testified that she first encountered or learned of Fletcher when she was called to holding tank 11 to assist when Fletcher was suspected to have suffered a seizure on September 5, 2017.  See Record Document 152, Exhibit B (Rachal Deposition) at 30.  Rachal described Fletcher as very erratic, combative and stated that he was shouting profanities at her and sweating profusely.  See id.  Rachal observed him sitting against the wall and falling slightly back from the sitting position and hitting his head, but stated that it was not a forceful hit in her opinion. See id. at 31.  Rachal observed a small silver dollar size goose egg and red petechiae dots on Fletcher's head.  See id.  She observed Fletcher to be speaking and verbally stimulated and admits she did not personally believe he had a seizure.  See id. at 37-38.  She reported that in her experience people in the postictal phase immediately following a seizure are non-coherent, usually unable to verbalize and have flaccid muscle tone for several minutes.  See id. at 38-39.  She did not observe any of these symptoms in Fletcher.  See id. at 37-40.

Fletcher was placed in a wheelchair and transferred to medical for observation. Chandler then took over his care while Rachal took on other duties.  Chandler contends

that she observed Fletcher in medical for two hours following the event.  See Record Document 144-2 at 4.  Chandler stated that she also took his vital signs, did a neuro evaluation checking his eyes and pupils and asking him to count fingers she held up. See Record Document 152, Exhibit A at 54-55. She determined he was totally alert and oriented.  See id.  Fletcher was able to squeeze her hand on command.  See id. at 55. Plaintiffs dispute certain of these facts, namely because the BSO shift supervisor's incident report contains a timeline of events and indicates that Fletcher was wheeled to medical at 8:06 a.m. and was brought to video court at 8:57 a.m. – only 51 minutes, not two hours, later.  See Record Document 146-12 at 2.  Yet, Chandler submits that she personally observed Fletcher doing well for two hours, his speech was normal and he experienced no loss of bowel or bladder control.  See Record Document 152, Exhibit A at 74.  Fletcher told Chandler he felt fine and did not report a headache, and she observed him walking with no trouble  See id. at 73-74.

Chandler testified that had it been an emergency situation, such as if Fletcher were in an active seizure or if she saw any evidence of a closed head injury, she would have called 911 immediately.  See id. at 59, 66.  Plaintiffs note that both Chandler and Rachal admit that no diagnostic testing, such as bloodwork, a CT scan, or an EKG, was performed on Fletcher.  Plaintiffs contend that Chandler and/or Rachal should have called 911.  Rachal admitted in her deposition that she was concerned Fletcher's behavior was linked more towards a withdrawal-type psychosis.  See Record Document 152, Exhibit B at 66.  She also stated that nurses were permitted to contact the doctor (here, Dr.

Roberts),[2] to call 911 in a medical emergency, or to transfer a patient to a medical facility. See id. at 62.  But neither Chandler nor Rachal called 911 or Dr. Roberts.

Chandler stated that she believed there was no medical emergency and she would therefore set Fletcher up to see Dr. Roberts when he was in.  See Record Document 152, Exhibit A at 59.  Chandler released Fletcher from medical and placed him on a 30 minute medical watch.  See id. at 77. Chandler maintains that it was her practice to advise the deputies when she placed an inmate on medical watch to check him every 30 minutes and report back any signs or abnormalities, and to tell them what to watch for.  Id. at 77-79.  Plaintiffs dispute that Chandler advised deputies regarding what to watch for or report. See Record Document 146-24 (Blake Smith Deposition) at 33-34.

At some point later on September 5, 2017, Chandler was alerted to the cell where Fletcher was being held due to his erratic behavior.  See Record Document 152, Exhibit A at 85-86.  Fletcher was "banging his head everywhere," "mad," "yelling," and "spitting on everybody."  Id. at 85.  Fletcher was angry he was in there and stated he "wanted to sue everybody."  Id. at 90.  At that point Chandler told the deputies to restrain him before he hurt himself.  See id. at 89.  Deputy De Barnett and Deputy Jeff Smith placed Fletcher in a restraint chair, put a spit mask on him, cuffed him and placed him in a padded cell

---

[2] In September 2017, a "Contract for Professional Services" between the Bossier Parish Police Jury, the BSO, and Louisiana State University Health Science Center ("LSUHSC-S") was in place.  See Record Document 112-2 (Contract).  Under the Contract, LSUHSC-S agreed to, among other things, provide outpatient medical care at the Bossier Correctional Facilities; provide clinical services at the Bossier Correctional Facilities; evaluate and treat inmates for medical problems during clinic hours; provide medical services during clinic hours; and assist in the review and update of policies and procedures for the Health Services Staff.  See Record Document 112-2 at 1-2.  Pursuant to the Contract, Dr. Roberts – an employee of LSUHSC-S – was providing on-site clinic service at the Bossier Maximum Security Facility, two days per week, half a day each day.  See id.; Record Document 139-4 (Dr. Roberts' Affidavit).

(Holding Tank 7) for his protection.  See id. at 89-91.[3]  Plaintiffs argue this conduct by Fletcher was not intentional, but rather another medical emergency.   Deputy De Barnett stated in his deposition that he believed Fletcher could possibly be having a second seizure.  See Record Document 146-26 at 41.  In her deposition, Chandler admitted that "based on [Fletcher's] behavior and the unknown reason for the behavior, and the medical history," Fletcher should probably have been in a hospital setting at this point.  See Record Document 152, Exhibit A at 91-92.[4]

Rachal testified that she was worried about Fletcher and asked Chandler how he was doing.  See Record Document 152, Exhibit B at 65-67.  She described being concerned about his erratic behavior and how combative and angry he was.  See id. at 66.  She said she and Chandler discussed it and initiated the withdrawal protocol and hoped it would clear it up for him, as it had worked for other patients in the past who were suffering from benzodiazepine withdrawal.  See id. at 67.

It was the practice of the Medical Clinic operating under Dr. Roberts that nurses were to begin protocols found in the standing orders based on their observations, and Dr. Roberts authorized such practice and signed off on it after the fact.  See id. at 95.  Rachal reported speaking with Fletcher's father, who reported that Fletcher had an issue with

---

[3] The BSO Restraint Chair policy provides that "inmates will not be left in the restraint chair for more than two (2) hours at a time."  Record Document 146-9 at 1.  Deputy De Barnett admitted in his deposition that the Management Order Activity Log indicates Fletcher was in the restraint chair for longer than two hours.  See Record Document 146-26 at 75; Record Document 146-8 at 1.

[4] Chandler also testified in her deposition that the correctional setting is "a different clientele and everyone is trying to fall, everyone wants to have a seizure, everyone is having a heart attack."  Record Document 152, Exhibit A at 66-67.  She later stated that it was likely correct that the only reason Fletcher did not get sent to the hospital for a CT scan was because he was a different clientele and because there are a lot of inmates who lie.  See id. at 68-69.

Xanax previously.  See id. at 80.  The father had no clear history regarding the quantity and said nothing about alcohol withdrawal.  See id. at 81.

On September 7, 2017, Chandler, Rachal and psychologist Dr. Anita Flye ("Dr. Flye"), returned to the cell so that Dr. Flye could meet with Fletcher.  See Record Document 152, Exhibit A at 93.  Prior to Dr. Flye's visit with Fletcher, Rachal reported to Dr. Flye that Fletcher had been on the withdrawal protocol for two days and was still behaving erratically.  See Record Document 152, Exhibit B at 78.  Rachal told Dr. Flye all that she knew about Fletcher up to that point.  See id. at 82-83.  Rachal stated Fletcher crawled out of the cell to meet with Dr. Flye and bit a chair as if he were an animal. See id. at 85.  Fletcher began answering Dr. Flye's questions regarding his depression history. See id. at 86.  Fletcher reported that he had been hearing voices and was hallucinating. See id. at 86-87.  Chandler stated that she observed Dr. Flye was able to have a normal conversation with Fletcher and Dr. Flye was calming to Fletcher.  See Record Document 152, Exhibit A at 93.  Dr. Flye instructed medical to give Fletcher Haloperidol (Haldol), Benztropine, and Sertraline. Id. at 102; see also Record Document 152, Exhibit B at 96.

Although Chandler does not recall Fletcher's specific behavior after being given these medications, she knows she went back to booking several times to check on him, to "lay eyes on him and see how he was doing."  Record Document 152, Exhibit A at 102. Rachal returned to Fletcher's cell at 1600 hours with Lieutenant Charles Bean and checked on Fletcher through the food portal.  See id. at 87-88.  Fletcher was lying down on a mat and was instructed to stand and present.  See id. at 88.  Rachal observed him to be very coherent.  See id.  She asked Fletcher how he felt and he told her he felt better. See id.  She asked if he was still seeing things, and he shook his head "no."  Id.  Rachal

8

did observe that he was excessively smiling in an exaggerated manner. <u>See id.</u> at 88. She believed this was indicative of manic psychosis, which can be a medical emergency. <u>See id.</u> at 88-89.  However, Rachal observed no acute distress from a visual inspection of his breathing. <u>See id.</u> at 90.  She did not conduct a physical exam.  <u>See id.</u> at 89.

Also on September 7, 2017, Rachal was called to Holding Tank 7 by the shift sergeant due to Fletcher constantly pressing on the door.  <u>See id.</u> at 99. She went to the cell and checked on him and noted she would continue to monitor him.  <u>See id.</u>  Later on September 7, 2017, Chandler spoke with Dr. Roberts and asked him to walk over and look at Fletcher. <u>See</u> Record Document 152, Exhibit A at 103. She recalls observing that Dr. Roberts did a quick neurological examination by speaking with Fletcher for a minute or two and asking how he was doing.  <u>See id.</u> at 103.  Chandler recalls Dr. Roberts giving no orders regarding medical care after Dr. Roberts spoke with Fletcher and does not recall any discussion of transferring the patient to another facility. <u>See id.</u> at 105.

The BSO Defendants submit that Fletcher remained on 30 minute medical watch for the remainder of the day on September 7, 2017.  <u>See</u> Record Document 144-2 (Bossier Parish Corrections Division Management Order Activity Log) at 15-20.  At approximately 2:50 a.m. on September 8, 2017, Fletcher was found not breathing by Deputy Jared Vicento.  <u>See</u> Record Document 144-2 at 8-10.  The autopsy report listed the cause of death as head and neck injuries with the contributory factor of mixed drug intoxication.  <u>See</u> Record Document 146-15 at 3.

The BSO Inmate Handbook provides

Non-emergency medical care will first begin in the facility itself.  Emergency medical care will be administered at LSU Medical Center.

Record Document 146-10 at 8.   The BSO Medical Services policy and procedure discusses Emergency Medical Services:

> Corrections personnel will promptly notify the medical staff or 911 of any emergency situation to ensure that inmates and staff who are in need of emergency treatment receive care. An emergency medical situation is any health/life threatening condition such as severe bleeding, unconsciousness, serious breathing difficulties, head injuries, severe pain, suicide attempt, severe burns, or on-set of bizarre behavior.

Record Document 146-7 at 2.

Plaintiffs assert the following claims against the BSO Defendants:

> Count I – Section 1983 Fourteenth Amendment inadequate medical care claim against Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith, Rachal, and Chandler.

> Count II – Section 1983 Fourteenth Amendment Supervisory Liability against Defendants Julian Whittington, Robert Chavis, Jeff Smith, and De Barnett.

> Count III – Section 1983 Fourteenth Amendment Duty to Intervene against Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith, Rachal, and Chandler.

> Count IV – Section 1983 Monell claim against the Bossier Sheriff's Office and Bossier Maximum Security Facility.

> Count VI – Negligence against Defendants Julian Whittington, Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith, Rachal, and Chandler.

> Count VII – Vicarious Liability against Defendants Julian Whittington (official capacity) and the Bossier Sheriff's Office.

Record Document 217.[5]

---

[5] The Second Amended Complaint also contains the following counts as to the BSO Defendants:  Count V – Medical malpractice against Defendants Rachal and Chandler; Count VIII – Indemnification against Defendants Julian Whittington (official capacity) and

## LAW AND ANALYSIS

### I.    Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil

Procedure when "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Quality Infusion Care, Inc. v. Health Care Serv.

Corp., 628 F.3d 725, 728 (5th Cir.2010).  "A genuine issue of material fact exists when

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

See id.  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for

---

the Bossier Sheriff's Office; Count IX - Survival Action; and Count X - Wrongful Death.
See Record Document 217.

It is clear from the record that the medical malpractice claim against Dr. Roberts
was part of a medical review panel proceeding and the state law negligence claims
against him were dismissed without prejudice.  See Record Documents 29, 41, & 49.  The
same cannot be said of the medical malpractice claims against Rachal and Chandler
found in the Second Amended Complaint.  The record as a whole is unclear as to the
status of these claims.  Specific analysis of the medical malpractice claims against Rachal
and Chandler does not appear in the summary judgment briefing – there is only analysis
as to general negligence claims.  See Record Document 144-3 at 18-19.  The BSO
Defendants list Count V (medical malpractice) as a "various Louisiana state law claim[] .
. . based in negligence."  Id. at 18.  Counsel shall be prepared to discuss the status of
these claims at the upcoming pretrial conference.  The Court makes no Rule 56 finding
as to these claims.

In its prior ruling on the Bossier Parish Police Jury's dispositive motion, this Court
granted summary judgment on the indemnification claim, noting that Plaintiffs had no
standing or right of action to bring such a claim, mainly because such a claim for
indemnity, even if one exists, would be an action personal to the named individual
defendant. See Record Document 231 at 3.  For these same reasons, summary judgment
in favor of the BSO Defendants is **GRANTED** as to any claim for indemnification made
by Plaintiffs against the BSO Defendants.

Finally, with the respect to Counts IX (survival action) and X (wrongful death), this
Court previously noted that there is no independent negligence claim under Louisiana
Civil Code Articles 2315.1 and 2315.2.  See Record Document 231 at 7.  "Rather, the
elements of negligence will constitute the "offense" that Plaintiffs must prove to establish
their survival action and wrongful death action."  Id.  Therefore, for the reasons set forth
infra in section IV(E), summary judgment in favor of the BSO Defendants, except
Chandler and Rachal, is **GRANTED** as to any independent negligence claim framed as
a survival action or wrongful death action.

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

## II.   Qualified Immunity

The BSO Defendants assert the defense of qualified immunity as to each and every federal and state constitutional claim asserted against theme in their individual capacities. See Record Document 144-3 at 19. The qualified immunity doctrine shields prison officials from civil liability "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." City of Tahlequah, Oklahoma v. Bond, 142 S.Ct. 9, 11 (2021), citing Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808 (2009). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." City of Tahlequah, 142 S.Ct. at 11.

When a defendant invokes qualified immunity, the plaintiff then carries the burden of demonstrating its inapplicability. See Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 194 (5th Cir. 2009). To satisfy such burden, a plaintiff must (1) claim that the defendants committed a constitutional violation under current law; and (2) claim that the defendants'

actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." Floyd v. City of Kenner, La., 351 F. App'x 890, 893–94 (5th Cir. 2009). "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 894. Courts are not to define clearly established law at too high a level of generality. See City of Tahlequah, 142 S.Ct. at 11. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (internal quotations and citations omitted). Such specificity is important because it is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation the officer confronts. See id. at 11-12. The objective unreasonableness inquiry requires us to examine an officer's belief that his or her actions were lawful under the particular circumstances. See Bush v. Strain, 513 F.3d 492, 502 (5th Cir.2008).

## III.   Deliberate Indifference Standard

The standard governing many of Plaintiffs' claims against the BSO Defendants is deliberate indifference. Fletcher was a pretrial detainee. Thus, the claims under Section 1983 for deliberate indifference to Fletcher's safety and serious medical needs is analyzed under the Fourteenth Amendment. See Hare v. City of Corinth, Miss., 74 F.3d 633, 639 (5th Cir. 1996). "The episodic act or omission of a state jail official does not violate a pretrial detainee's constitutional right to be secure in his basic human needs, such as medical care and safety, unless the detainee demonstrates that the official acted or failed to act with deliberate indifference to the detainee's needs." Id. at 647–48.

13

"Inadequate medical care by a prison doctor can result in a constitutional violation for purposes of a § 1983 claim when that conduct amounts to deliberate indifference to the prisoner's serious medical needs, constituting the unnecessary and wanton infliction of pain." Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999) (internal quotations and citations omitted).  Under the deliberate indifference standard, a prison official is not liable unless he knows of and disregards an excessive risk to inmate health or safety.  See id. at 534.  Malpractice or negligent care does not rise to the level of deliberate indifference. See id.  "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind."  Id.

"The response demanded of jail officials with actual knowledge of [a] risk of serious injury is that he not act with deliberate indifference."  Hare, 74 F.3d at 649.  This standard cannot "be transmuted into a negligence inquiry," as the deliberate indifference standard requires "the subjective intent to cause harm" and it "cannot be inferred from a prison guard's failure to act reasonably."  Id.  "If it could, the standard applied would be more akin to negligence than deliberate indifference."  Id.

## IV.   Cross Motions for Summary Judgment Relating to the Claims Against the BSO Defendants

### A.   Inadequate Medical Care Claims against Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith

There are essentially cross motions for summary judgment on the inadequate medical care claims against Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, and Blake Smith – all deputies with the BSO.  The BSO Defendants seek summary judgment as to the inadequate medical care claims against these defendants, arguing none of these deputies

ever refused treatment to Fletcher, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Conversely, Plaintiffs argue they are entitled to summary judgment against De Barnett, Robert Chavis, Blake Smith, and Julie Cochran because (a) De Barnett placed Fletcher in a restraint chair with a spit-mask over his head for almost three hours during a medical emergency, and (b) Robert Chavis, Blake Smith, and Julie Cochran completely failed to watch Fletcher during a medical watch.

Deputies De Barnett, Robert Chavis, Blake Smith, and Julie Cochran are prison guards, not medical personnel.  Even assuming for purposes of the instant motion that Fletcher was left in a restraint chair longer than an internal policy permitted and that the observation during the medical watch by Robert Chavis, Blake Smith, and Julie Cochran was not ideal, the summary judgment evidence shows that these prison guards responded to every medical incident involving Fletcher, reported their observations to medical, and notified medical of changes in Fletcher's behavior.  The allegation that the deputes completely failed to watch Fletcher during the medical watch is unsupported by the record.  See Record Documents 146-11, 146-12, 146-22, 146-25, 146-26, & 146-30. The summary judgment evidence simply does not show that they refused to treat Fletcher, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs as required for deliberate indifference.  In fact, once Fletcher was turned over to medical personnel, the prison guards' responsibility was then to defer to the findings of the medical personnel.  See Roberts v. Lessard, 841 F. App'x 691, 695 (5th Cir. 2021). When the medical personnel gave direction, the prison guards' obligation was to act in

accordance with those directions and findings and refrain from "interfering with the treatment once prescribed." Id.  The Court therefore holds that Plaintiffs have failed to come forward with evidence demonstrating a genuine issue that the aforementioned BSO Defendants acted with deliberate indifference. Without deliberate indifference, Plaintiffs have failed to establish a Fourteenth Amendment violation. Thus, the BSO Defendants are protected by qualified immunity.  Summary judgment in favor of BSO Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, and Blake Smith is **GRANTED** as to Plaintiffs' Fourteenth Amendment inadequate medical care claims.

### B.  Inadequate Medical Care Claims against Defendants Rachal and Chandler

There are essentially cross motions for summary judgment on the inadequate medical care claims against Defendant Chandler.  The BSO Defendants have also moved for summary judgment as to the inadequate medical care claim against Rachal.  It is clear that Chandler and Rachal – both BSO nurses – provided medical care to Fletcher and there is no dispute that deliberate indifference is a stringent standard.  Deliberate indifference is subjective; it requires a showing that prison officials had actual knowledge of a risk and disregarded it. See Petzold v. Rostollan, 946 F.3d 242, 249 (5th Cir. 2019). Knowledge may be inferred from the circumstances, particularly where the risk of harm is obvious. See Hope v. Pelzer, 536 U.S. 730, 738, 122 S.Ct. 2508, 2514 (2002).  Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference. See Hernandez v. Texas Dep't of Protective & Regulatory Services, 380 F.3d 872, 883 (5th Cir. 2004); Alton v. Texas A&M Univ., 168 F.3d 196, 201 (5th Cir. 1999).

However, this Court believes that the credibility of Chandler and Rachal is at issue and factual questions remain as to their subjective, actual knowledge of the risk to Fletcher and whether they disregarded it.  Chandler's deposition testimony establishes she knew Fletcher hit his head and was experiencing erratic behavior, both likely emergency medical situations under the BSO Medical Services policy and procedure. Further, during her deposition, Chandler – in more than one instance – referred to inmates such as Fletcher as "different clientele."  See Record Document 152, Exhibit A at 66-69. She also stated after the second incident on September 5, 2017, "based on [Fletcher's] behavior and the unknown reason for the behavior, and the medical history," Fletcher should probably have been in a hospital setting.  See id. at 91-92.  Yet, Chandler stated she did not believe there was a medical emergency.  She did not talk to the doctor until September 7, 2017, never called for the doctor, never called 911, and never ordered transport.  This Court believes it is for the jury to determine if Chandler's conduct constituted deliberate indifference.  See Hope, 536 U.S. at 738, 122 S.Ct. at 2414 (knowledge may be inferred from the circumstances).  Likewise, Rachal observed a small silver dollar size goose egg and red petechiae dots on Fletcher's head.  She observed his erratic behavior, how combative, and how angry he was.  She watched him crawl out of his cell to meet Dr. Flye and then bite a chair "like an animal."  She testified in her deposition that she observed Fletcher's excessive smiling in an exaggerated manner, which can be indicative of manic psychosis and a medical emergency.  Yet, like Chandler, she did not talk to the doctor, never called for the doctor, never called 911, and never ordered transport.  Her credibility is at issue and there are genuine disputes of material fact regarding Rachal's knowledge of Fletcher's serious medical needs, namely if she

knew of and disregarded an excessive risk to his health.  Thus, summary judgment is **DENIED** as to the Fourteenth Amendment inadequate medical care claims against Chandler and Rachal.[6]

   C.   **Supervisory Liability and <u>Monell</u> Claims**

   In Count II of the Second Amended Complaint, Plaintiffs allege a Section 1983 Fourteenth Amendment supervisory liability against Defendants Julian Whittington, Robert Chavis, Jeff Smith, and De Barnett.  Under Section 1983, an official cannot be held vicariously liable for the conduct of those under his supervision.  <u>See Alderson v. Concordia Par. Corr. Facility</u>, 848 F.3d 415, 420.   A supervisory official is only accountable for his own acts of deliberate indifference and for implementing unconstitutional policies that causally result in the alleged injury to the plaintiff.  <u>See id.</u>  A supervisor's deliberate indifference generally requires a plaintiff to allege at least a pattern of similar violations.  <u>See</u> <u>Rios v. City of Del Rio Texas</u>, 444 F.3d 417, 427 (5th Cir. 2006) (citations omitted).  Here, Plaintiffs do not attempt to demonstrate a pattern.  The only alleged instances of unconstitutional practices are restricted to Fletcher's experience.  Thus, Plaintiffs' supervisory liability claims fail as a matter of law.

   In Count IV, Plaintiffs allege a Section 1983 <u>Monell</u> claim against the Bossier Sheriff's Office and Bossier Maximum Security Facility.  More specifically, Plaintiffs submit they are entitled to summary judgment on the <u>Monell</u> claim asserted against Sheriff Whittington and the Bossier Sheriff's Office because the Sheriff knowingly adopted a log policy that failed to explain how a medical watch is to be performed.

---

[6] Both the Plaintiffs and the BSO Defendants' Motions for Summary Judgment are **DENIED** as to the inadequate care claim against Chandler.

"[I]n order to survive summary judgment [on a <u>Monell</u> claim], Plaintiffs must demonstrate that a question for trial remains as to whether action pursuant to official municipal policy caused the[] injury." <u>Hicks-Fields v. Harris Cnty., Texas</u>, 860 F.3d 803, 808 (5th Cir. 2017).  In other words, "[t]o establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." <u>Id.</u>  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." <u>Id.</u>  To be held liable on the basis of a policy, "the plaintiff must show, among other things, either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences ... A showing of simple or even heightened negligence will not suffice." <u>Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force</u>, 379 F.3d 293, 309 (5th Cir. 2004).

Here, there is no dispute that BSO Defendants maintained policies and procedures to ensure that inmates were provided with appropriate medical care.  <u>See</u> Record Document 144-2 (Medical Services Policy & Procedure) at 11-14.  Such policy provides that the Bossier Sheriff's Office Corrections Division will have medical personnel on duty or all for both emergency and non-emergency medical care for inmates. <u>See id.</u>  The policies are taught to the corrections personnel during training, and they are available for review by personnel at all times. <u>See</u> Record Document 152, Exhibit C (Rule 30(b)(6) Video Deposition of Bossier Sheriff's Office) at 35-36. The Louisiana Department of

Corrections performs an audit of the medical services provided every three years and confirms compliance by the Bossier Sheriff's Office.  <u>See id.</u> at 26.  The medical services policy and procedure sets forth a medical watch protocol as determined by the nurses. <u>See id.</u> at 27-29.  The policies also permit the nurses to provide care under the standing orders of Dr. Roberts.  <u>See id.</u> at 24.  Based upon this competent summary judgment evidence, the Bossier Sheriff's Office has not established a policy that itself violates federal law or authorizes/directs the deprivation of federal rights.

Likewise, there is no summary judgment evidence that the Medical Services Policy & Procedure, specifically the medical watch protocol, was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences.  Again, a showing of simple or even heightened negligence will not suffice to establish deliberate indifference.  Moreover, "a single incident is usually insufficient to demonstrate deliberate indifference."  <u>Est. of Davis ex rel. McCully v. City of N. Richland Hills</u>, 406 F.3d 375, 382 (5th Cir. 2005).  Rather, the "plaintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured."  <u>Id.</u> at 383.  Again, as noted previously, Plaintiffs do not attempt to demonstrate a pattern in this case.  The only alleged instances of unconstitutional practices are restricted to Fletcher's experience. Thus, Plaintiffs' <u>Monell</u> claims fail as a matter of law.

### D.    Section 1983 Fourteenth Amendment Duty to Intervene Claims

In Count III of the Second Amended Complaint, Plaintiffs allege a Fourteenth Amendment duty to intervene claim against BSO Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith, Rachal, and Chandler.  The BSO Defendants have moved for summary judgment

on such claims.  First, the Court notes that Plaintiffs did not present argument or evidence on the failure to intervene claim in their opposition to the BSO Defendants' motion.  Their failure to raise an argument in opposition to summary judgment on this claim equates to waiver.  See Indep. Coca–Cola Employees' Union of Lake Charles, No. 1060 v. Coca–Cola Bottling Co. United, Inc., 114 F. App'x 137, 143-44 (5th Cir. 2004) (unpublished) (holding that party's failure to raise an argument in opposition to summary judgment waived the argument).  Moreover, the failure to intervene claim against the BSO Defendants fails as a matter of law.  In a prison setting, the duty to intervene encompasses a prison guard or correctional official's duty to intervene and attempt to end an assault on an inmate.  See Coleman v. LeBlanc, No. CV 19-395-JWD-SDJ, 2020 WL 4679545, at *5 (M.D. La. July 28, 2020), report and recommendation adopted, No. CV 19-395-JWD-SDJ, 2020 WL 4680145 (M.D. La. Aug. 12, 2020).  Here, there was no assault on Fletcher.  Moreover, such a duty does not extend to medical officials in the prison setting.  See Smith v. Donate, No. 4:10-CV-2133, 2012 WL 1899323, at *6 (M.D. Pa. Apr. 5, 2012), report and recommendation adopted, No. CIV. 4:10-2133, 2012 WL 1899318 (M.D. Pa. May 24, 2012).[7]  Summary judgment in favor of the BSO Defendants is **GRANTED** as to the Fourteenth Amendment duty to intervene claim.

---

[7] In Smith, the court held:

> Here, it is undisputed that Dr. Zaloga is not an employee or correctional official at this county prison. Rather, he simply is an independent private contractor who provides medical services to inmates. As a private contractor, Dr. Zaloga has no law enforcement or corrections standing, status, responsibilities, duties, or training, and Dr. Zaloga is not authorized by the warden to intervene in correctional matters such as cell extractions. Given these undisputed facts, Smith's failure to intervene claim against Dr. Zaloga cannot prevail because the first essential element of that claim, a

**E.      State Law Negligence Claims**[8]

In Count VI of the Second Amended Complaint, Plaintiffs assert negligence claims against BSO Defendants Julian Whittington, Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, Blake Smith, Rachal, and Chandler.  The BSO Defendants now seek summary judgment as to these claims.

First, the Court notes that Plaintiffs did not present argument or evidence on the state law negligence claims in their opposition to the BSO Defendants' motion.  Their failure to raise an argument in opposition to summary judgment on this claim equates to waiver.  See Indep. Coca–Cola Employees' Union of Lake Charles, No. 1060 v. Coca–Cola Bottling Co. United, Inc., 114 F. App'x 137, 143-44 (5th Cir. 2004) (unpublished) (holding that party's failure to raise an argument in opposition to summary judgment waived the argument).

Notwithstanding, the Court will proceed to analyze the direct negligence claims against the BSO Defendants.  "The duty of prison authorities to provide inmates with medical care requires that such care be reasonable."  Harper v. Goodwin, 930 So.2d 1160, 1163 (La. App. 2 Cir. 2006).  Louisiana Revised Statutes 15:760 provides that

---

legal duty to intervene, is simply absent. Therefore, this claim should be dismissed with respect to Dr. Zaloga.

Smith, 2012 WL 1899323, at *6.

[8] See supra footnote 5 for a complete discussion of Counts V – Medical Malpractice against Defendants Rachal and Chandler; Count VIII – Indemnification against Defendants Julian Whittington (official capacity) and the Bossier Sheriff's Office; Count IX - Survival Action; and Count X - Wrongful Death.  See infra section IV(F) for a discussion of the vicarious liability claim.

"where large numbers of prisoners are confined the proper authorities in charge shall provide hospital quarters with necessary arrangement, conveniences, attendants, etc."

Louisiana provides a duty-risk analysis to all tort claims. See Roberts v. Benoit, 605 So. 2d 1032, 1041–42 (La. 1991).  The standard negligence analysis courts employ in determining whether to impose liability under Civil Code Article 2315 is the duty-risk analysis:  1) Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?; 2) Did the defendant owe a duty to the plaintiff?; 3) Was the duty breached?; and 4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?  See id.  All four inquiries must be affirmatively answered.  See id.  Cause in fact is generally a "but for" inquiry.  See id. at 1042.

The BSO Defendants had a duty to provide inmate Fletcher with reasonable medical care.  As discussed in detail *supra* in the supervisor liability/Monell claims section, there were policies and procedures in place to provide medical care to all inmates of the Bossier Maximum Security Facility.  However, this Court has found genuine disputes of material fact and credibility issues preventing summary judgment as to the medical care provided by Chandler and Rachal.  Thus, for these reasons and those reasons previously stated regarding the separate and distinct actions of the individual BSO Defendants, the pendant Louisiana state law negligence claims against all BSO Defendants except Chandler and Rachal shall be dismissed.

### F.    Vicarious Liability Claims

In Count VII, Plaintiffs allege a vicarious liability claim against Defendants Julian Whittington (official capacity) and the Bossier Sheriff's Office.  Under Louisiana law,

employers are vicariously liable for the torts of their employees under Louisiana Civil Code Art. 2320, which provides, in part:

> Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
>
> In the above cases, responsibility only attaches, when the masters or employers . . . might have prevented the act which caused the damage, and have not done it.

La. C.C. Art. 2320.  Although Article 2320 provides that employers are only liable when they might have prevented the act which caused the damage, the courts of this state have consistently held that employers are vicariously liable for any torts occasioned by their employees. See Ermert v. Hartford Ins. Co., 559 So.2d 467 (La.1990).  This judicial interpretation of Article 2320 has been codified at La. R.S. 9:3921, which provides, in part: "every master or employer is answerable for the damage occasioned by his servant or employee in the exercise of the functions in which they are employed."

Here, there is no dispute that Chandler and Rachal are BSO employees.  Because of genuine disputes of material fact and credibility determinations for the trier of fact, this Court denied summary judgment as to the Fourteenth Amendment inadequate medical care claims and the state law negligence claims against Chandler and Rachal.  Thus, the Court must **DENY** summary judgment as to the vicarious liability claims against Defendants Julian Whittington (official capacity) and the Bossier Sheriff's Office in relation to the conduct of Chandler and Rachal.  Summary judgment as to the vicarious liability claims relating to the underlying conduct of all other BSO Defendants is **GRANTED**.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (Record Document 144) filed by all BSO Defendants seeking summary judgment as to all of the Plaintiffs' claims is **GRANTED IN PART AND DENIED IN PART**.   The motion is **GRANTED** as to the following claims:  Fourteenth Amendment inadequate medical care claims against BSO Defendants Robert Chavis, Jeff Smith, De Barnett, Julie Cochran, Cody Callicoatte, Jared Vicento, Matthew Creamer, and Blake Smith; all supervisory liability claims; all <u>Monell</u> claims; all Fourteenth Amendment duty to intervene claims; state law negligence claims against all BSO Defendants except Chandler and Rachal; vicarious liability claims except those relating to the conduct of Chandler and Rachal; and indemnification.   The motion is **DENIED** as to the following claims: the Fourteenth Amendment inadequate medical care claims against Chandler and Rachal; state law negligence claims against Chandler and Rachal; and vicarious liability claims relating to the conduct of Chandler and Rachal.

The Plaintiffs' Motion for Partial Summary Judgment (Record Document 146) seeking judgment as a matter of law against BSO Defendants Julian Whittington, Robert Chavis, De Barnett, Julie Cochran, Blake Smith, and Katrina Chandler is **DENIED**.

**IT IS SO ORDERED.**

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 23rd day of August, 2022.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT